UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIA SUAREZ,<br><br>                                    Plaintiff,<br><br>v.<br><br>CARLOS DEL TORO, Secretary, U.S. Department of the Navy,<br><br>                                    Defendant. | Case No.:  22-cv-0021-GPC-BLM<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**<br><br>**[ECF No. 42]** |

On June 3, 2022, Defendant Carlos Del Toro ("Defendant" or "Del Toro") filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6).  ECF No. 42.  The parties have fully briefed the pending motion to dismiss.  ECF Nos. 44, 45. For the reasons set forth below, the Court **GRANTS** in part and **DENIES** in part the motion.

///

///

///

///

1

# I. BACKGROUND

## A.    Factual Background

Suarez served as an Equal Employment Specialist for the Department of Navy, Bureau of Medicine and Surgery, in San Diego, California.  ECF No. 1 at 3; ECF No. 38 at 5.  This position required Suarez to process and resolve informal and formal complaints of discrimination and reprisal complaints involving alleged violations of the Title VII Civil Rights Act of 1964.  ECF No.1 at 3.  Suarez is Hispanic in race, Honduran in national origin, is over the age of forty, and presents with a brown complexion.  ECF No. 38 at 5. Suarez also suffers from a heart condition, depression, anxiety, asthma, and vertigo.  *Id.* at 5.  Suarez alleges that while she was employed with the Department of Navy, her co-workers and supervisors discriminated against her based on her race, skin color, national origin, gender, age, and alleged disabilities, and retaliated against her for Equal Employment Opportunity ("EEO") activity.  *Id.* at 3.

Suarez worked for Defendant from January 11, 2016 until April 30, 2018 when she retired.  ECF No. 1 at 3; ECF No. 38 at 5.  Initially, Suarez's first line supervisor was Danny Kealoha ("Kealoha").  ECF No. 38 at 5.  When Kealoha took on a new position in February 2017, Deputy EEO Officer Hamilton McWhorter ("McWhorter") became Suarez's new first line supervisor.  *Id.*  In Spring of 2017, and at the direction of Suarez's higher-level supervisor, Therese Guy ("Guy"), McWhorter was charged with directing and critiquing Suarez's work.  *Id.* at 5-6.

Suarez was initially assigned to handle all EEO Intakes and to process all informal complaints for San Diego County, which included UIC 00259 and UIC 68094.  *Id.* at 8. However, on March 24, 2017 McWhorter advised Suarez that she would be required to manage all UIC00259 Complaints (San Diego Naval Hospital), Alternate Dispute Resolution Requests ("ADR"), and Reasonable Accommodation Requests ("RA") due to her status as a "Senior" EEO Specialist.  *Id.* at 6, 9.  Suarez states that she was not a Senior

EEO Specialist, which is ranked as a GS-13, but was actually a GS-12.  *Id.* at 6.  As a result, Suarez alleges that this change in assignment required her to take on a higher case load. *Id.* at 6, 8.  Suarez's co-worker, Mario Villalba ("Villalba"), who worked in the EEO office for 4 years at that point, advised McWhorter that assigning one person this workload was unfair because, according to Villalba's estimates, it consisted of 60-80% of the workload and should be shared between employees.  *Id.* at 6.  In contrast, Suarez alleges that Villalba—who is younger, male, and not disabled—was assigned to handle only RA cases, which consists of a smaller case load.  *Id.* at 7, 8.  As a result, Suarez alleges that she struggled to keep up with the volume of work her new assignment entailed.  *Id.* at 9.

On April 4, 2017, McWhorter directed Suarez to process one of Villalba's formal EEO Complaints.  *Id.* at 6.  McWhorter reassigned this case to Suarez because Villalba refused to respond to the EEO Investigator's request for information.  *Id.* at 6.  Suarez alleges that because this complaint was not from UIC00259, the only reason for McWhorter to assign it to Suarez was to treat Villalba more favorably than Suarez.  *Id.* at 6.  Suarez raised her concern about taking on this additional case, but Suarez was ultimately forced to complete Villalba's work for him.  *Id.* at 6, 8.

Around that time, in the spring of 2017, Guy directed Suarez to seek assistance and direction from McWhorter.  *Id.* at 7.  However, Suarez alleges that when she would ask for assistance, McWhorter would become abrasive and would demean her verbally and in emails.  *Id.*  For example, Suarez requested additional training and assistance processing RA requests from both McWhorter and Guy on multiple occasions, verbally and by email. *Id.* at 7.  McWhorter advised Suarez that because she was a GS-12 she should already know how to process RA Requests.  *Id.*  Guy advised her that employees were given on the spot individual tutorials, peer-to-peer reviews, recommendations for online self-training, and subject matter Standard Operating Procedures (SOP).  *Id.*  However, Suarez alleges that, according to the Department of Navy, Civilian Human Resources Manual, Section 1606,

Procedures for Processing Requests for Reasonable Accommodation strongly recommends formal training, which she was never given. *Id.* at 7. Further, Suarez alleges that Villalba refused to assist Suarez with peer-to-peer reviews, which Suarez brought to McWhorter's attention on March 24, 28, and 29, 2017. *Id.* at 8. Suarez alleges that McWhorter continued to refuse to direct Villalba to assist Suarez while she worked for Defendant. *Id.* at 8. On April 20, 2017 Suarez sent Guy an email following up on her request for RA training, but never received a response. *Id.* at 7. Suarez alleges that these refusals to assist or train Suarez was a form of sabotage to prevent Suarez from timely and properly completing her assignments and causing her other duties to be delayed. *Id.* at 7.

In April 2017 Suarez was denied the opportunity to attend the EEO "Back to Basics" training in New Orleans, Louisiana. *Id.* at 7. Instead, Villalba was selected to attend this training. *Id.* at 8.

On April 27, 2017 Suarez contacted Guy and explained that she was experiencing stress, anxiety, shortness of breath and asthma and that McWhorter and Villalba continuously harassed her about her need to retire. *Id.* at 8. For example, on or around May 10, 2017, Villalba advised Kealoha that Suarez should retire and apply for Disability Retirement because she was sick. *Id.* at 9. This caused Suarez to begin feeling anxious about Villalba's conversations with her co-workers and supervisors about her health and need to retire. *Id.* at 9. In July 2017 Suarez's co-worker John Love overheard Villalba telling Suarez's other co-workers that Suarez filed an EEO Complaint and was openly discussing Suarez's need to retire. *Id.* at 10. Suarez reported this to Guy, but she took no corrective action to stop Villalba's behavior. *Id.* at 10.

On April 28, 2017, Suarez contacted Guy reiterating her health concerns and issues with McWhorter. *Id.* at 8-9. Guy advised her that she was aware of McWhorter's abrasive behavior and that she would ask him to tone it down with Suarez. *Id.* at 8-9. However, Suarez alleges that McWhorter's abrasive behavior continued. *Id.* at 9. Suarez alleges that

4

McWhorter even made light of his behavior in his April 23, 2018 EEO Declaration stating that even "[m]y wife says I'm an 'a—hole.'" *Id.* at 9.

On May 5, 2017 Suarez experienced an anxiety attack while at work and subsequently requested EEO counseling due to the ongoing harassment. *Id.* at 9. Suarez also filed an informal EEO complaint on or about that same day after her anxiety attack and was placed on two weeks of medical leave. ECF No. 38 at 24; ECF No. 44 at 19. On May 9, 2017, after deciding to not reassign Suarez's cases to her co-workers while she was on medical leave, Guy learned that one of Suarez's cases had become untimely and chose to keep the case assigned to her. ECF No. 38 at 24. Guy eventually reassigned the case to another EEO Specialist, but not until after the untimely case was brought to the attention of Human Resource Specialist Christine Coble, who noted that Guy should have reassigned Suarez's case to someone else to process. ECF No. 44 at 20. Suarez alleges that Guy was attempting to make Suarez appear incompetent. *Id.*

On May 15, 2017 Guy reprimanded Suarez for providing Guy's contact information to a Union Representative who requested to speak with Villalba's supervisor. *Id.* at 11. Suarez alleges that none of her co-workers had ever been reprimanded for providing a supervisor's contact information and that there was no policy or procedure against it. *Id.* at 11.

On May 16, 2017, Villalba entered Suarez's office and, while yelling, used the word "fuck," and repeatedly made hand gestures at Suarez with his middle finger. *Id.* at 11. Suarez tried to put her head down, but Villalba raised his voice and told Suarez to "look at me," continued to use expletives, and put his middle finger in front of Suarez's face. *Id.* at 11. Villalba then "walked to her office door, bent down and pointed his middle finger to his buttocks" and advised Suarez that "[w]hoever wants to get me fired, fuck them!" *Id.* at 11. Suarez reported this incident to Kealoha, but nothing was done to stop Villalba's behavior. *Id.* at 12. Suarez also attempted to report this incident to her Human Resources

Director Stephanie Wright and the attorney, Patricia Wellings, but neither were in their office at the time. *Id.* at 11-12. Despite the complaint, no action was taken by Defendant to stop Villalba's behavior toward Suarez. *Id.* at 12. For example, a few days after Villalba's aggressive outburst, Villalba walked past Suarez while she was copying documents at the printer located in Human Resources and again gave her the middle finger. *Id.* at 12.

On June 9, 2017 Suarez had an asthma attack at work and was taken to the hospital because her oxygen levels were low. *Id.* at 13. Suarez then went to a psychiatrist and was placed off work from June 15 to June 30, 2017. *Id.* at 13.

On July 5, 2017 Suarez again asked McWhorter for assistance on what she needed to do to process two RA cases. Instead of providing any help, McWhorter responded in an email chastising her for requesting assistance and advised her that "[y]ou have been getting paid as a full functioning Specialist for quite some time, so to hear that you are experiencing difficulties with RA requests/case management is quite concerning to me." *Id.* at 14. Suarez alleges that McWhorter again denied Suarez any tutorial, peer-to-peer review, or recommendations for online self-training. *Id.* at 14.

On July 6, 2018 McWhorter sent out an email advertising the Defense Equal Opportunity Management Institute's Disability Program training (DEOMI). *Id.* at 15. Suarez responded on July 7, 2017 and requested an opportunity to participate. *Id.* McWhorter responded on July 14, 2017 and advised Suarez that it was too late to apply, even though the deadline was not until July 17, 2017, again denying Suarez additional training. *Id.*

On August 9, 2017 McWhorter sent Suarez an email chastising her for emailing him information he requested without using a greeting. *Id.* at 16. In contrast, Suarez alleges that Villalba was allowed to curse at her, direct obscene gestures at her, outright refuse to help her as required for peer-to-peer reviews, and could refuse assignments which resulted

6

in Suarez having to take on more work. *Id.* at 16. Suarez alleges that she raised these issues with Guy, and on August 10, 2017 Guy advised Suarez that she did not respond to her complaints because Suarez had filed an EEO Complaint against her. *Id.* at 25.

From September 2017 until January 22, 2018 Suarez went on medical leave to receive open heart surgery and to recover. *Id.* at 16-17. During that time, James Cummins ("Cummins") became Suarez's new supervisor. *Id.* at 16. When Suarez returned, she provided Cummins with medical documentation that she continued to suffer from depression and anxiety. *Id.*

On January 24, 2018 Suarez began to feel dizzy and experience shortness of breath while at work. *Id.* at 24. She contacted her doctor and made an appointment due to these symptoms. *Id.* When she contacted Cummins, he advised her that he was not going to approve any Sick Leave or Leave Without Pay for her. *Id.* Cummins also advised Suarez that she would need to give him three-day's notice to go to the doctor in the future. *Id.* That same day, Suarez made a verbal request to Cummins for an RA to work from home two days a week due to the dizzy spells and related vertigo that she was experiencing. *Id.* Suarez alleges that several of her co-workers worked remotely full-time, but that Cummins denied Suarez's RA because the request did not make sense to him. *Id.* at 17-18.

On January 31, 2018 Villalba caused another RA case to be assigned to Suarez, despite Suarez still having never received training or guidance on how to handle these types of cases. *Id.* at 18. Suarez brought this issue to Cummins, who advised Suarez she would nevertheless need to process Villalba's RA case. *Id.* at 18. Suarez was forced to go to Villalba's cubicle for assistance, and while there began suffering from a severe vertigo attack, became dizzy, and almost fainted. *Id.* at 18. An ambulance was called, and paramedics transported Suarez to the emergency room for medical treatment. *Id.* at 18-19.

On March 27, 2018 Cummins issued Suarez an Official Memorandum for "Unsatisfactory Attendance." *Id.* at 19. Cummins then advised Suarez that she was being

charged 20.83 hours of being Absent Without Leave ("AWOL").  *Id.*  Suarez states that this AWOL charge was a result of her experiencing a vertigo attack at work on January 31, 2018 and, as a result, being taken by ambulance to the hospital.  *Id.*  Suarez states that she provided Cummins with medical documentation the following day on February 1, 2018. *Id.*  Cummins' memorandum also indicated that if Suarez did not make herself immediately available for duty on a regular full-time basis that she may be removed from federal service. *Id.*

### B.    Procedural Background

Suarez filed a formal EEO charge against Defendants in September 2017.  ECF No. 38 at 4.  On March 25, 2021 the EEO Commission ("EEOC") provided Suarez with a decision and order that granted the Agency's Motion for a decision without a hearing.  *Id.* On April 8, 2021 the Navy issued its Final Agency Decision and notified Suarez of her right to sue.  *Id.* at 5.  On July 2, 2021 Suarez filed her initial Complaint in the Northern District of California.  ECF No. 1.  On July 13, 2021 Suarez filed her First Amended Complaint ("FAC").  ECF No. 6.  On January 7, 2021 the case was transferred to the Southern District of California and was assigned to the undersigned for all future proceedings.  ECF No. 29.   Defendant filed a motion to dismiss on February 10, 2022 [ECF No. 33], which the Court granted.[1]  ECF No. 37.  Suarez filed her Third Amended Complaint ("TAC") on May 20, 2022.  ECF No. 38.  Defendant filed a renewed Motion to Dismiss on June 3, 2022.  ECF No. 42.

---

[1] The Court notes that Suarez's Second Amended Complaint ("SAC") was deficient for various reasons which were laid out in its Order granting Defendant's February 10, 2022 motion to dismiss.  *See* ECF No. 37.  As discussed below in greater detail, Suarez has remedied many of the previous deficiencies by providing additional facts and greater detail to the allegations she asserts in her TAC.

1    Suarez makes six claims in her TAC alleging (1) discrimination based upon race,

2 color and national origin in violation of Title VII of the Civil Rights Act of 1964 (Title

3 VII); (2) discrimination based upon gender in violation of Title VII; (3) retaliation in

4 violation of Title VII; (4) discrimination based upon disability in violation of the

5 Rehabilitation Act of 1973 (Rehabilitation Act); (5) retaliation in violation of the

6 Rehabilitation Act; and (6) discrimination based upon age in violation of the Age

7 Discrimination in Employment Act of 1967 ("ADEA").  *See* ECF No. 38.

8    **II. LEGAL STANDARD**

9    A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a complaint, i.e.

10 whether the complaint lacks either a cognizable legal theory or facts sufficient to support

11 such a theory.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001) (citations omitted).

12 For a complaint to survive a Rule 12(b)(6) motion to dismiss, it "must contain sufficient

13 factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

14 *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550

15 U.S. 544, 570 (2007)).  In reviewing the motion, the Court accepts the "factual allegations

16 in the complaint as true and construe[s] the pleadings in the light most favorable to the

17 nonmoving party."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031

18 (9th Cir. 2008).  However, "[t]hreadbare recitals of the elements of a cause of action,

19 supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678 (citing

20 *Twombly*, 550 U.S. at 555).  The court is also not required to accept as true mere legal

21 conclusions.  *Id.*  Determination of "whether a complaint states a plausible claim is context

22 specific, requiring the reviewing court to draw on its experience and common sense."  *Id.*

23 at 663-64.

24 ///

25 ///

26 ///

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## III. DISCUSSION

### A.    Subject Matter Jurisdiction

To establish subject matter jurisdiction over Title VII claims, a plaintiff must have exhausted his or her administrative remedies by filing a charge with the EEOC.  *See Vasquez v. County of Los Angeles*, 349 f.3d 634, 644 (9th Cir. 2003).  Suarez's claims fall within the scope of the EEOC's investigation because in September 2017 Suarez filed a formal EEO charge, and, on April 8, 2021, after investigating the complaint, the Navy issued a Final Agency Decision and a Notice of Right to Sue.  ECF No. 38 at 5.  Accordingly, the Court may consider the merits of her claim.

### B.    Disparate Treatment Under Title VII (Counts One and Two)

The TAC alleges discrimination based upon race, color and national origin (Count One) and gender (Count Two) in violation of Title VII.  *Id.* at 20-22.  "[T]o establish a prima facie case of discrimination, a plaintiff must show [that] (1)  … [s]he belongs to a protected class; (2) [s]he was qualified for the position; (3)  she was subject to an adverse employment action; and (4) similarly situated individuals outside [her] protected class were treated more favorably."  *Leong v. Potter*, 347 F.3d 1117, 1124 (9th Cir. 2003) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 702, 802 (1973).

Defendant argues that Suarez failed to show that the Navy subjected her to any adverse employment action because of her protected characteristics (Suarez's race, skin color, national origin, or gender) or that she was treated differently than Suarez's similarly situated coworkers who did not share her protected status.  ECF No. 42 at 7.  Suarez argues that she was treated differently than her coworker, Villalba, who was not in her protected class.  ECF No. 44 at 5.  Defendant does not dispute that Suarez belongs to a protected class or that she was qualified for the position.  The Court must determine (1) whether Suarez was subjected to an adverse employment action, and (2) whether similarly situated individuals were treated more favorably.  ECF No. 42 at 6; ECF No. 44 at 5.

1    **1.     Adverse Employment Action**

2        An adverse employment action is one that "materially affects the compensation,

3    terms, conditions, or privileges of employment." *Davis v. Team Elec. Co.*, 520 F.3d 1080,

4    1089 (9th Cir. 2008).  "Adverse employment actions may include not only actions an

5    employer affirmatively takes against an employee (e.g. firing or demoting the employee)

6    but also situations in which the employer denies an employee a material employment

7    benefit or opportunity that was otherwise available to her." *Campbell v. Hawaii Dept. of*

8    *Educ.*, 892 F.3d 1005, 1013 (9th Cir. 2018) (citing cases in which denials of promotion and

9    transfer opportunities were considered adverse employment actions).

10       Suarez contends that she was assigned to manage all UIC00259 complaints, ADR

11   requests, and RA requests, which constituted between 60-80% of the entire department's

12   workload.[2]  ECF No. 38 at 6.  Suarez alleges that Villalba, who holds the same title (EEO

13   Specialist), has the same paygrade (Grade 12), and who is not in Suarez's protected groups

14   (Villalba is younger than Suarez, not Honduran, and not female), was not required to handle

15   a workload as heavy as Suarez's.  *Id.* at 9.  Despite this increased and disproportionate

16   workload, on April 4, 2017 McWhorter directed Suarez to process a formal EEO Complaint

17   that was supposed to be completed by Villalba.  *Id.* at 6.  On January 31, 2018 Villalba

18   caused a second case to be reassigned to Suarez.  ECF No. 38 at 18.  In contrast, when

19   Suarez was on medical leave, her supervisor Guy refused to reassign her cases to her

20   coworkers until they became untimely.  *Id.* at 10.  Suarez's Human Resources Specialist

21   later advised Guy that Suarez's RA cases should have been reassigned sooner because she

22   was on medical leave.  *Id.* at 10-11.

23

24

25

26   [2] In 2016 Plaintiff also inherited her co-worker's, pending cases when he left the EEO
27   Office.  ECF No. 38 at 8.

28                                                                          22-cv-0021-GPC-BLM

1    Similarly, on July 5, 2017, when Suarez asked McWhorter for guidance on handling

2    two RA cases because she was never trained to handle these types of cases, McWhorter

3    emailed Suarez chastising her for requesting help.  ECF No. 38 at 14.  McWhorter advised

4    Suarez that she is "a senior EEO Specialist and should have full understanding of all aspects

5    of [the] EEO process" and that she has "been getting paid as a full functioning Specialist

6    for quite some time, so to hear that [she is] experiencing difficulties with RA requests/case

7    management is quite concerning." *Id.* at 14.  Suarez requested additional training multiple

8    times, but her requests would often go unanswered.  *Id.* at 7, 9, 14, 15.  On one occasion

9    Suarez's request was denied because, according to McWhorter, her application for the

10   training was submitted too late, even though the application deadline had not yet passed.

11   *Id.* at 15.

12   Suarez also argues that her supervisor, James Cummins, erroneously charged her

13   with over 20 hours of AWOL without any evidence.  ECF No. 38 at 6.  This charge

14   stemmed from Suarez experiencing a vertigo attack while at work and being taken by

15   ambulance to the emergency room.  *Id.* at 19.  Cummins was aware of Suarez's vertigo

16   attack and Suarez provided him with medical documentation the next day.  *Id.*

17   Nevertheless, Cummins tried to charge Suarez for being AWOL.  *Id.*  In contrast, Suarez

18   alleges that her coworker, Villalba, was hardly, if ever, reprimanded.  For example, on May

19   5, 2017 Suarez experienced an anxiety attack at work and filed an EEO discrimination

20   complaint.  *Id.* at 23.  When Suarez returned to work on May 16, 2017, Villalba entered

21   Suarez's office and began yelling at her, gesturing at her with his middle finger, and

22   repeatedly yelling expletives.  *Id.* at 11.  Suarez alleges that Villalba "bent down and

23   pointed his middle finger to his buttocks" and said, "whoever wants to get me fired, fuck

24   them!"  *Id.*  This was not the first or last time Villalba acted aggressively toward Suarez,

25   but despite reporting this event to her supervisors, nothing was done to stop Villalba's

26   behavior.  *Id.* at 12.  Finally, because of Suarez's dizzy spells and vertigo, she requested to

27

28

work from home two days a week.  *Id.* at 17.  Suarez's request was denied even though other EEO Specialists in Suarez's office were allowed to work from home and one even works remotely full-time from another state.  *Id.* at 18.

In sum, Suarez alleges that she was reassigned a disproportionate and heavier workload than her similarly situated coworker, Villalba, who is not a female and not Honduran.  Although Suarez was expected to take on Villalba's cases when he needed help, Suarez alleges she did not receive this same benefit, even if she was out on medical leave. Suarez also alleges that her requests for additional training would go unanswered, denied before the deadline to apply closed, or would be met with criticism, despite being assigned work that she had never received training for.  In contrast, Villalba was selected to attend at least one training that Suarez was denied permission to attend.  Suarez alleges that she was charged with informal and formal complaints for unwarranted reasons, but that Villalba was allowed to act aggressively towards Suarez without being reprimanded by supervisors. Suarez also alleges her request to work remotely was denied despite other EEO Specialists being allowed to work remotely.

Considering these circumstances in the aggregate and reading the evidence in the light most favorable to Suarez, the Court finds that these circumstances amounted to adverse employment actions that detrimentally affected the conditions of Suarez's employment.  *See, e.g.*, *Ray v. Henderson*, 217 F.3d 1234, 1244 (9th Cir. 2000) (holding that actions that decrease an employees pay, the time the employee has to complete the same amount of work, or the ability to influence workplace policy all qualify as adverse employment actions); *Strother v. Southern California Permanente Medical Grp.*, 79 F.3d 859, 869 (9th Cir. 1996) (holding that an employee suffered from adverse employment actions when, after complaining of discrimination, the employee was excluded from meetings, seminars and positions that would have made her eligible for salary increases, was denied secretarial support, and was given a more burdensome work schedule); *see also*

1   *Gleason v. Berhardt*, 2021 WL 288666, at *3 (D. Idaho, May 28, 2021) (denying an

2   employee training opportunity that could impair the employee's career is sufficient to

3   constitute an adverse employment action); *Arbigon v. Multnomah Co.*, 2010 WL 2038839,

4   at *16-17 (D. Or. May 20, 2010) (denial of training that prevents an employee from

5   learning his or her job properly constitutes an adverse employment action).

6         **2.   Similarly Situated Individuals Treated More Favorably**

7         The Court must next determine whether Suarez's similarly situated coworkers were

8   treated more favorably. Suarez contends that her coworker, Villalba, who is not a female

9   and not Honduran was given less work than her, was given training opportunities she was

10  denied, and was allowed to act aggressively toward her, amongst other things. ECF No.

11  38 at 6, 9, 11-12. Defendant disagrees. *See* ECF No. 42; ECF No. 45 at 2.

12        **a.  Race, color, and national origin**

13        First, regarding Suarez's allegation of discrimination on the basis of race, color, and

14  national origin, Suarez alleges that she is Hispanic, of Honduran national origin, with a

15  brown complexion, and that she was "treated differently than her peers who were not

16  Honduran *with a brown complexion*." ECF No. 38 at 20 (emphasis added). Suarez further

17  states that "[d]ue to her race (Honduran) and color (Brown), she was subjected to disparate

18  treatment." *Id.* However, Suarez's sole comparator for the purpose of establishing

19  discrimination on the basis of race, color, and national origin is Mario Villalba and the

20  TAC is not clear whether he is of a different race, color, or national origin. If Villalba is

21  not brown or is of a different national origin, Count 1 would sufficiently allege a claim for

22  discrimination. *Cf. Lam v. Univ. of Haw.*, 40 F.3d 1551, 1561 n. 16 (9th Cir. 1994) (holding

23  that the distinction between a Vietnamese plaintiff and a Chinese comparator—both Asian

24  candidates—for the purposes of showing discrimination on the basis of national origin, is

25  relevant); *Petrov v. Hebert Research, Inc.*, 2015 WL 4508708 (W.D. Wa. July 24, 2015)

26  (when interpreting disparate treatment on the basis of national origin, the definition applies

27

28

to "Bulgarian" national origin but does not extend to broad geographic regions, such as "Eastern European," "Asia," or "Latin America").

The TAC fails to allege facts sufficient to establish discrimination based on race, color, or national origin, as such, the Court will **GRANT** the motion to dismiss Count 1 and permit Suarez to file a Fourth Amended Complaint which should make clear whether Villalba is of a different race, color, and/or national origin.

### b. Gender

Suarez next claims in Count 2 disparate treatment on the basis of gender.  ECF No. 38 at 21.  Defendant argues that Suarez failed to "allege any facts from which to plausibly infer that [Defendant] subjected [Suarez] to any adverse employment action" because of her protected characteristics.  ECF No. 42 at 7.  The Court disagrees.

Here, Suarez alleges that she was assigned 60-80% of the entire department workload [ECF No. 38 at 6], was required to take on some of Villalba's cases [*id.* at 6, 18], was denied additional training despite applying on time [*id.* at 7, 9, 14, 15], was chastised for requesting help [*id.* at 14], was charged with being AWOL despite providing medical documentation [*id.* at 19], and was expected to endure Villalba's sexually aggressive conduct while at work [*id.* at 11].  In comparison, Villalba, Suarez's male coworker, was assigned a smaller workload, was able to have some of his cases reassigned to Suarez, was provided additional trainings, and was allowed to conduct himself in a sexually aggressive manner without any apparent ramifications.

Considering these circumstances in the aggregate and reading the evidence in the light most favorable to Suarez, the Court finds that similarly situated individuals were treated more favorably than her on the basis of gender. *See, e.g.*, *Davis*, 520 F.3d 1080, 1089 (9th Cir. 2008) (holding that an employee who was ignored by supervisors and assigned a disproportionate amount of work compared to her male co-workers established

a prima facia case of disparate treatment).  Defendant's motion to dismiss Suarez's disparate treatment claim on the basis of gender as alleged in Count 2 is **DENIED**.

### C.   Hostile Work Environment Under Title VII (Counts One and Two)

Under Title VII, a hostile work environment exists where "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (quotations and citation omitted).  "To prevail on a hostile workplace claim based on either race or sex, a plaintiff must show:  (1) that she was subjected to verbal or physical conduct of a racial or sexual nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." *Vasquez v. County. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003).  "To determine whether conduct was sufficiently severe or pervasive to violate Title VII, [the Court] look[s] at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Id.* (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001)).  "The working environment must both subjectively and objectively be perceived as abusive" in order to permit recovery.  *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000).

Defendant argues that Suarez failed to allege severe or pervasive verbal or physical conduct of a racial or sexual nature so as to support a reasonable inference that Suarez's working environment was subjectively and objectively abusive.  ECF No. 42 at 8; ECF No. 45 at 6.  Suarez contends that the negative treatment she received from her supervisors set her up for failure until she was forced to retire.  ECF No. 44 at 16.  The Court **DENIES**

Defendant's motion to dismiss Suarez's hostile work environment claim for the reasons set forth below.

On May 16, 2017 Villalba entered Suarez's office and began yelling at her, gesturing at her with his middle finger, and repeatedly yelling expletives. ECF No. 38 at 11. Suarez put her head down on her desk to ignore Villalba's outburst, but he raised his voice and commanded Suarez to look at him. *Id.* Suarez alleges that Villalba then "bent down and pointed his middle finger to his buttocks" and said, "whoever wants to get me fired, fuck them!" *Id.* Although Suarez does not specifically state how many times or how often Villalba acted in such a way, Suarez explains that this was not the first time Villalba swore at Suarez or made obscene gestures at her. *Id.* Suarez contends that a few days later, Villalba passed by her and again gave her the middle finger and continued to swear and use his middle finger toward Suarez on multiple occasions thereafter. *Id.* at 12. Undoubtedly, Villalba's gesticulation of his middle finger toward his buttocks was sexually aggressive in nature. *See Robinson v. Jacksonville Shipyards, Inc.*, 760 F. Supp. 1486, 1522-23 (M.D.Fla. 1991) (holding that to violate Title VII on the basis of sex, the verbal or physical conduct must be either sexual in nature or perpetuated because of the recipient's gender). While Villalba's egregious conduct is relevant to Suarez's hostile work environment claim, the proper focus is on Defendant's response to Villalba's conduct. *See Fried v. Wynn Law Vegas, LLC*, 18 F.4th 643, 650 (9th Cir. 2021) (holding that "the proper focus for the hostile work environment claim [is] on the employer's response to the [hostile] coworker's conduct.").

In *Fried*, a salon manicurist-employee received an unwanted proposition for sex by a male customer while at work. *Fried*, 18 F.4th at 646. The employee reported the unwanted sexual advance to his manager and explained that he no longer felt comfortable interacting with the customer. *Id.* According to the employee, the manager nevertheless directed him to complete the pedicure service with the customer. *Id.* The Ninth Circuit

held that the district court erred by ruling on summary judgment, as a matter of law, that the employer's response to the employee's report of the customer's harassment did not create a hostile work environment. *Id.* at 652. The circuit court reasoned that the manager's response effectively condoned the customer's unwanted sexual advance and conveyed to the employee that he was expected to tolerate the harassment as part of his job. *Id.* (holding that while "an employer's prompt corrective response can insulate an employer from liability for an employee's hostile work environment claim," an employer's failure to intervene after learning of harassing conduct can create a hostile work environment); *see also Folkerson v. Circus Circus Enters., Inc.*, 107 F.3d 754, 756 (9th Cir. 1997) (holding that "an employer may be held liable [] where the employer either ratifies or acquiesces in the harassment by not taking immediate and/or corrective action when it knew or should have known of the conduct").

Here, Suarez's supervisors were aware of Villalba's conduct toward Suarez. ECF No. 38 at 12. Suarez alleges that not only did her supervisors fail to stop Villalba's conduct, but actively contributed to the hostile work environment he created by continuously putting Suarez in a position where she was forced to interact with Villalba. For example, on April 4, 2017, and again on January 31, 2018—after Villalba's explicit episode in Suarez's office—Suarez's supervisors reassigned one of Villalba's cases to Suarez for her to handle. *Id.* at 6, 18. On at least one of these occasions, Suarez was forced to go to Villalba's cubicle to ask him questions about the RA case, where she subsequently experienced shortness of breath and dizziness, and fainted. *Id.* at 18. Villalba's unwanted conduct nevertheless continued. On April 27, 2017 Suarez informed her supervisors Guy and McWhorter that Villalba continued to harass her about her need to retire. *Id.* at 8. Suarez alleges that McWhorter not only participated in this conversation with Villalba but agreed with him that Suarez should retire. *Id.* On the face of the TAC, the lack of corrective measures implemented by Suarez's supervisors allowed Villalba's continuous harassment to

permeate Suarez's work environment with "discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions" of her employment and created an abusive working environment.  *See Nat'l R.R. Passenger Corp.*, 536 U.S. at 116.

Further, based on Suarez's prior complaint, the Court previously held that this case was distinguishable from *Pringle v. Wheeler*, 478 F.Supp.3d 899 (N.D. Cal. 2020) because Suarez failed to show that she was subjected to a pattern of hostile treatment.  *See* ECF No. 37 at 13-14 ("*Pringle* is therefore distinguishable from the present case, in which Plaintiff points only to a single AWOL designation and fails to show 'a concerted pattern of harassment of a repeated, routine, or generalized nature.'").  Suarez's TAC remedies this deficiency by, for example, alleging Villalba engaged in obscene behavior toward her on May 16, 2017, again a couple of days later while she was copying documents, and on additional occasions after that.  ECF No. 38 at 12.  Additionally, Suarez's TAC alleges that she requested additional training or assistance handling her workload multiple times, but her supervisors would chastise her for requesting help [*id.* at 14], would fail to respond to her requests [*id.* at 7], would deny her requests when trainings became available, even before the deadline to apply passed [*id.* at 8, 15].  As a result, Suarez's stress and anxiety increased and she "struggled to keep up with her workload."  *Id.* at 8-9.  Such frequent occurrences, no longer isolated to a single event, are sufficient to show hostile conduct pervasive enough to alter the conditions of Suarez's employment.

As such, the Court finds the allegations are sufficient to deny Defendant's motion to dismiss.  *Cf.*, *Christian v. Umpqua Bank*, 984 F.3d 801, 809 (9th Cir. 2020) (consider "all the circumstances," including whether the discriminatory conduct was "physically threatening or humiliating" (quoting *Davis*, 520 F.3d at 1095)).   As such, Defendant's motion to dismiss Suarez's hostile work environment claim is **DENIED**.

/ / /

### D.     Retaliation Under Title VII (Counts Three)

"The elements of a prima facie retaliation claim are, (1) the employee engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action." *Davis*, 520 F.3d at 1093-94 (citing *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064 (9th Cir. 2002)).  For purposes of a Title VII retaliation claim, an action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity.  *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000).  The standard for an adverse action in the context of retaliation is lower than in other discrimination claims under Title VII, the ADEA, and the Rehabilitation Act because the antiretaliation provision of Title VII protects a broader range of activities.  *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006).  In the Ninth Circuit, "adverse employment action" is interpreted broadly.  *Ray*, 217 F.3d at 1243 (noting that actions such as lateral transfers, unfavorable job references, and changes in work schedules could constitute adverse employment actions for retaliation claims, but that offensive utterances and ostracism by coworkers do not).  Informal and formal complaints with the EEOC are protected activities. *Id.* at 1240.  Because the Court has already determined that Suarez suffered an adverse employment action, the Court must determine whether Suarez adequately alleged that the adverse employment action is causally linked to her EEOC complaints.

### 1.     Causal Link

"Title VII retaliation claims must be proved according to traditional principles of but-for causation …. This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Cent. v. Nassar*, 570 U.S. 338, 360 (2013).  "To establish a causal connection between her protected activity and the adverse actions, a plaintiff may allege direct or circumstantial evidence from which causation can be inferred, such as an

employer's 'pattern of antagonism following the protected conduct,' or the temporal proximity of the protected activity and the occurrence of the adverse action." *Cloud v. Brennan*, 436 F.Supp.3d 1290, 1301 (N.D. Cal. Feb. 3, 2020) (quoting *Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 850 (9th Cir. 2004)).  Circumstantial evidence, viewed in the aggregate, can be more than sufficient to state a prima facie case for unlawful retaliation. *Black v. Grant Cnty. Pub. Util. Dist.*, 820 Fed.App'x. 547, 552 (9th Cir. 2020); *see also Kasbarian v. Equinox Holdings, Inc.*, 739 Fed.App'x. 397, 400 (9th Cir. 2018) ("For purposes of making a prima facia showing, the causal link element may be established by an inference derived from circumstantial evidence." (quoting *McRae v. Dep't of Corr. & Rehab.*, 142 Cal.App. 4th 377, 388 (2006)).

Here, Suarez filed an informal EEO complaint on or about May 5, 2017 after she experienced an anxiety attack at work for which she was placed on two weeks of medical leave.  ECF No. 38 at 24; ECF No. 44 at 19.  Approximately four days later, Guy chose to keep Suarez's cases assigned to her while she was on medical leave, allowing them to become untimely.  ECF No. 38 at 25.  Guy eventually reassigned the case to another EEO Specialist, but not until after the untimely case was brought to the attention of Human Resource Specialist Christine Coble, who noted that Guy should have reassigned Suarez's case to someone else to process.  ECF No. 44 at 20.  Suarez alleges that Guy was attempting to make Suarez appear incompetent.  *Id.*  On May 15, 2017 Guy reprimanded Suarez for providing Guy's contact information to a Union Representative, despite another EEO Specialist in Suarez's office similarly sharing Guy's contact information without any issues.  ECF No. 44 at 21.

Suarez alleges that her supervisors began abusing her verbally and in writing when she returned to work in or around early July 2017.  ECF No. 44 at 19.  For example, McWhorter would send Suarez demeaning, condescending, and intimidating emails, he would chastise Suarez for requesting help, would openly discuss Suarez's need to retire

with her coworkers, and gossiped about the EEO complaint she filed.  ECF No. 38 at 8; ECF No. 44 at 21.

Further, despite Suarez's requests for additional training, McWhorter denied Suarez's ability to even apply for any such training.  For example, when Suarez returned from medical leave in early July 2017, applications for the Disability Program Management training course opened with a deadline of July 17, 2017.  ECF No. 44 at 20.  Suarez emailed McWhorter about the opportunity, but McWhorter advised Suarez it was too late to apply, even though the deadline to apply had not yet passed.  *Id.* at 20.  McWhorter allowed Villalba to participate in that training program.  *Id.* at 20.  In January 2018, Suarez's supervisor Cummins advised Suarez that she would not be granted additional medical leave and that she was required to give three days' notice before she could take time to attend any doctor visits.  ECF No. 38 at 26.  Suarez alleges that no other employees were required to give notice before seeking medical advice from a doctor.  *Id.*  Suarez alleges throughout her TAC that these events transpired after she filed her EEO Complaint and that because of these events she became stressed and anxious and sought medical help from her physician.  *Id.* at 27.  Because these events occurred after she filed her EEO Complaint and reading the evidence in the light most favorable to Suarez, the Court finds that Suarez has established but-for causation for the purpose of surviving Defendant's motion to dismiss.  *Cloud*, 436 F.Supp.3d at 1301 ("pattern[s] of antagonism following [] protected conduct" is sufficient to infer causation); *Palomo v. City of Sanger*, No. 14-cv-1769-TLN-SAB, 2015 WL 5734421, at *9 (E.D. Cal. Sept. 28, 2015) (holding that a plaintiff can established but-for causation where a sequence of actions, such as smiling and winking, can collectively link an adverse employment action to protected activity).  Accordingly, Defendant's motion to dismiss Suarez's claim of retaliation is **DENIED**.

///

///

1

2

**D.**     **Discrimination and Failure to Accommodate Under the Rehabilitation Act (Count Four)**

3

The Rehabilitation Act, 29 U.S.C. §791, prohibits employment discrimination by the

4

federal government against those with disabilities, applying the standards of Title I of the

5

Americans with Disabilities Act ("ADA"). 29 U.S.C. § 791(f).  Both Title II of the ADA

6

and the Rehabilitation Act prohibit discrimination on the basis of disability, though the

7

ADA applies only to public entities, while the Rehabilitation Act applies to all federally-

8

funded programs.  *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002).  "To state a

9

prima facie case under the Rehabilitation Act, a plaintiff must demonstrate that (1) she is a

10

person with a disability, (2) who is otherwise qualified for employment, and (3) suffered

11

discrimination because of her disability."  *Walton v. U.S. Marshals Servs.*, 493 F.3d 998,

12

1005 (9th Cir. 2007), *superseded on other grounds by statute*.  "Once an employee requests

13

an accommodation, 'the employer must engage in an interactive process with the employee

14

to determine the appropriate reasonable accommodation.'"  *Weeks v. Union Pac. Railroad

15

Co.*, 137 F.Supp.3d 1204, 1217 (E.D. Cal. 2015) (quoting *EEOC v. UPS Supply Chain

16

Sols.*, 620 F.3d 1103, 1110 (9th Cir. 2010)).  "An employer who fails to engage in such an

17

interactive process in good faith may incur liability if a reasonable accommodation would

18

have been possible."  *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002).  The plaintiff

19

bears the initial burden of showing that a reasonable accommodation was possible.  *Id.*  If

20

the plaintiff can establish a prima facia case, the burden "then shifts to the employer to

21

articulate some legitimate, nondiscriminatory reason for the challenged action."  *Chuang

22

v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1123-24 (9th Cir. 2000).

23

Here, Defendant does not dispute that Suarez is an individual with a disability or that

24

she is otherwise qualified for employment.  Instead, Defendant argues that Suarez has not

25

"plausibly alleged that she suffered discrimination *because* of her disability." ECF No. 42

26

at 8 (emphasis in original).  Suarez contends that Defendant's refusal to accommodate her

27

28

reasonable accommodation request was in violation of the Rehabilitation Act and a failure to engage in the interactive process.  ECF No. 38 at 27.  The Court agrees with Suarez.

Suarez's TAC alleges that on January 24, 2018 she requested the ability to telework from home two days a week due to her dizzy spells and related vertigo, but that her supervisor Cummins denied her request.  ECF No. 38 at 17, 27.  Suarez argues that "[o]ther EEO Specialists are allowed to work from home, and one even works remotely from Pennsylvania on a full-time basis." *Id.* at 18.  Given Suarez's accommodation request and the undisputed allegation that some of her co-workers are allowed to work remotely, Suarez has shown that her request to telework from home two days a week was possible.[3]  *See Aki v. Univ. of Cal. Lawrence Berkeley Nat'l Lab.*, 74 Supp.3d 1163, 1175 (N.D. Cal. 2014) ("A reasonable accommodation may include job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." (citing 42 U.S.C. § 12111(8)); *see also U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 402 (2002) ("An accommodation is reasonable if it is "reasonable on its face, i.e., ordinarily or in the run of cases.").  Nevertheless, Suarez alleges that her supervisor denied her request "out of hand." ECF No. 38 at 18.  Given this, the burden shifts to Defendant to articulate some legitimate, nondiscriminatory reason for denying Suarez's request.  However, Defendant fails to provide any such reasoning in its

---

[3] The Court previously denied Suarez's claim for disparate treatment or failure to accommodate under the Rehabilitation Act because (1) she failed to show that she suffered discrimination because of her disability, and (2) because her allegation that Defendant failed to engage in the interactive process was not sufficiently supported by the SAC.  *See* ECF No. 37 at 12-13.  Here, Suarez remedies that deficiency by showing that a reasonable accommodation was possible because some of her co-workers already enjoyed the benefit of working remotely.

1    motion to dismiss or its reply.  *See* ECF Nos. 42, 44.  Accordingly, contrary to Defendant's

2    assertion, the Court finds that Suarez has plausibly alleged that she suffered discrimination

3    because of her disability.  *See Vinson*, 288 F.3d 1145 at 1154 ("A failure to provide

4    reasonable accommodation can constitute discrimination under section 504 of the

5    Rehabilitation Act.").  For the reasons above, Defendant's motion to dismiss Suarez's

6    claims for disparate treatment and for failure to accommodate under the Rehabilitation Act

7    is **DENIED**.

8            **F.       Disparate Treatment Under the ADEA (Count Six)**

9            The Age Discrimination in Employment Act (ADEA) makes it unlawful to discharge

10    any individual due to that individual's age.  29 U.S.C. § 623(a)(1).  To establish a prima

11    facie case of disparate treatment under the ADEA, a plaintiff must show that she "was (1)

12    at least forty years old, (2) performing [her] job satisfactorily, (3) discharged, and (4) either

13    replaced by substantially younger employees with equal or inferior qualifications or

14    discharged under circumstances otherwise 'giving rise to an inference of age

15    discrimination.'"  *Diaz v. Eagle Produce Ltd. Partnership*, 521 F.3d 1201, 1207 (9th Cir.

16    2008) (omission in original) (quoting *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281

17    (9th Cir. 2000)).  An inference of discrimination "can be established by showing the

18    employer had a continuing need for the employees' skills and services in that their various

19    duties were still being performed . . . or by showing that others not in their protected class

20    were treated more favorably."  *Id.* at 1207-08 (quoting *Coleman*, 232 F.3d at 1281).

21           Defendant argues that Suarez's claim should be dismissed because she has not

22    plausibly and factually alleged adverse action, overt discrimination, or disparate treatment

23    because of her age.  ECF No. 42 at 10.  Suarez contends that, after she was forced to retire,

24    her work was given to younger employees, and that while she was an EEO Specialist,

25    younger employees were able to refuse work assigned to them but that she was not.  ECF

26    No. 44 at 9.

27

28

Suarez satisfies the first two requirements because she alleges in her TAC that she is older than 40 years old and because she has provided a performance assessment indicating that she "has resolved more than 4 cases in the last 6 months, [and] *she has done an outstanding job*." ECF No. 38 at 3, 195 (emphasis added).  Suarez alleges that she was forced to resign (i.e., she was constructively discharged) because of the hostile work environment caused by her co-worker Villalba, because her request to work remotely was denied, and because Defendant refused to engage in the interactive process with her.  *Id.* at 20.

Constructive discharge requires a plaintiff to show that the "working conditions [became] so intolerable that a reasonable person in the employee's position would have felt compelled to resign."  *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007) (citing *Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004)).  The standard to prove a constructive discharge claim under the ADEA is higher than that required to prove a hostile work environment claim.  *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000); *see also Poland*, 494 F.3d at 1184 ("We set the bar high for a claim of constructive discharge because federal antidiscrimination policies are better served when the employee and employer attack discrimination within their existing employment relationship, rather than when the employee walks away and then later litigates whether his employment situation was intolerable.").

The Court has found hereinabove that Suarez has sufficiently alleged a claim for hostile work environment.  The remaining issue would be whether those conditions were sufficiently egregious and intolerable that she felt compelled to resign. *See Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000).   *See Manatt v. Bank of America*, 339 F.3d 792, 804 (9th Cir. 2003).  This determination is fact dependent and, taking the allegations in the TAC as true, the motion to dismiss this claim is **DENIED**.

///

**IV. CONCLUSION**

The Court **GRANTS** in part and **DENIES** in part Defendant's Motion to Dismiss in accordance with the above.   Suarez is **GRANTED** leave to file a Fourth Amended Complaint as to Count 1.  Any Fourth Amended Complaint should be filed within thirty (30) days of the issuance of this Order.

**IT IS SO ORDERED.**

Dated:  September 8, 2022

Hon. Gonzalo P. Curiel
United States District Judge

27

22-cv-0021-GPC-BLM